## 40311. JOHNSON v. GREEN.

Judgment affirmed without opinion pursuant to Rule 59 (Code Ann. § 24-4559).

*All the Justices concur.*

DECIDED NOVEMBER 29, 1983.

*Richard E. Kirby,* for appellant.
*H. Martin Huddleston,* for appellee.

WELTNER, Justice, concurring.

I agree that the judgment of the trial court should be affirmed, and submit this special concurrence because I believe that the issues raised in this appeal are of substantial importance to the general public, and because this case provides an opportunity to review some of the increasingly vexatious aspects of what we call "common law marriage."

Johnson claims that she is the widow (by "common law") of Russell, and that Russell lacked testamentary capacity, which contention was a basis of Johnson's caveat to the purported will of Russell, as propounded by Green, named as executrix.

Green denied the existence of a marriage between Russell and Johnson, and the case was submitted to a jury on the issue of marriage *vel non.* The jury returned a verdict against Johnson, finding that there was no marriage. The trial court thereupon determined that Johnson lacked standing and dismissed her caveat. The will was admitted to probate, and from that sequence of events this appeal is taken.

To determine this simple question — whether Amy Johnson and Charlie Russell were married — the court heard twenty witnesses and amassed a transcript of 338 pages to which were appended 17 exhibits.

After verdict and judgment a motion for new trial was denied, an application for discretionary review was granted by this Court, notice of appeal was filed, the case was docketed here and argued by counsel for both parties. It is now more than a year since the filing for probate of the will, though courts and counsel have proceeded expeditiously.

This massive expenditure of energy and of public and private resources was directed to the resolution of such elemental a question as *should be* answered without cavil: was there a marriage?

The genesis of "common law marriage" is well-known, and need not be repeated here. It is a heritage from our frontier days, as well as a means of avoiding the disadvantage of illegitimacy which rests upon

children whose parents failed to accomplish a ceremonial marriage. There can be no criticism of the reasons underlying the initial recognition of "common law marriage." There is, however, substantial reason to inquire critically whether that law serves the present age.

The issue of "common law marriage" arises in circumstances as varied as the lives of the people:

A man is killed at a work-site. Before it can be determined whether the death is compensable under the workers' compensation law, there must first be determined the identity of the widow — sometimes from a host of bereaved who appear from the distant past and from far reaches of the country to mourn the passage of the deceased.

A husband is cited for failure to pay alimony. His defense is that, although the parties had been divorced, they have now remarried under the "common law."

A witness is called to testify against a criminal defendant. Objection is made that she, as "common law" wife, is not compellable to testify.

A man and woman who briefly shared a dwelling part ways. One claims the property of the other as alimony by virtue of "common law marriage."

In each of the cases, a jury must decide whether or not there was a marriage. This list is by no means exhaustive. Indeed, an electronic survey reveals that since 1955, the appellate courts of this state have dealt with "common law marriage" in no less than 105 cases!

What is more significant, however, is that current social mores seem likely to generate a greater number of such disputes in the future — the experience of California courts standing as proof.

Turning to the present appeal, the trial court charged the following: "If a cohabitation between a man and a woman is shown to have been illicit in its inception, in the absence of proof to the contrary, the illicit relation will be presumed to have continued throughout the period of cohabitation. Such presumption may be overcome by direct or circumstantial evidence affirmatively showing that, pending the illicit relation, the parties entered into an agreement to become husband and wife, and thereafter continued the cohabitation in the new relationship." The court further charged "... that when an arrangement between the parties begins in an illicit arrangement, the burden is on the party asserting the validity of the marriage to show that the illicit relationship ended and that the parties did actually enter into a marriage contract." These instructions are assigned as error.

Both charges are correct statements of the present law. *Brown v.*

*Brown,* 234 Ga. 300, 302 (215 SE2d 671) (1975), *Fireman's Fund Ins. Co. v. Smith,* 151 Ga. App. 270, 271 (259 SE2d 675) (1979).

I suggest that we can relieve our people and our courts from the cost and caprice of "common law marriage" *not* by its abolition, but by rational extension of the rule in *Brown,* supra.

It is already the law that when a purported "common law marriage" is shown to have grown out of an illicit arrangement the burden is upon the party claiming the marriage to establish it by preponderance of the evidence. We need now only delineate that evidentiary quantum which will suffice for such a preponderance.

There should be, in my opinion, but two instances which enlightened policy can recognize as adequate to carry this burden.

This first is — obviously — proof of a ceremonial marriage in substantial accord with the requirements of statute law.

The second is the birth of a child or children to the parties.

The latter fully preserves our state's policy (betimes) of minimizing the burden of illegitimacy.

Nor would such a rule invalidate a marriage in which parties (*not* then engaged in an illicit arrangement) contract a non-ceremonial marriage simultaneously with commencement of cohabitation. Nor would the expenditure of the $13.00 required for a marriage license be an undue burden on the poor.

If it be the policy of the law to foster marriage as an institution essential to the stability and health of the Republic, we ill-serve that goal by discounting the existence of this most important of all human relationships to a swearing match — akin to the question of which driver had the green light; or, which of two brawlers struck the first blow; or, how long did the pain of whiplash endure.

Finally, if marriage is a state "not to be undertaken lightly" (as observed at almost every wedding) it should not be too burdensome to require of parties who intend to commit their very lives to each other that they make plain to all the world such an intent by undergoing a ceremony of marriage.